IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Jimmy Martin and Lucky Strike LLC, | ) |
| Plaintiffs, | ) C/A No. 2:06-400-DCN |
| vs. | ) |
| | ) **ORDER and OPINION** |
| Robert Stewart, as Chief of the South Carolina Law Enforcement Division; Henry McMaster, as Attorney General of the State of South Carolina; and Ralph Hoisington, as Solicitor of the Ninth Judicial Circuit, | ) |
| Defendants. | ) |

## **I.    BACKGROUND**

Plaintiffs Jimmy Martin ("Martin") and Lucky Strike, LLC ("Lucky Strike") assert constitutional challenges to portions of the South Carolina Video Game Machines Act, S.C. Code Ann. §§ 12-21-2710 - 2712 (2000), and request this court enjoin the statutes' enforcement. Defendants Robert Stewart, Henry McMaster and Ralph Hoisington are named in their official capacities[1] as law enforcement officers under the rubric of Ex Parte Young, 209 U.S. 123 (1908).

Martin manufactures video amusement machines in South America and seeks to design and import a machine which can be used legally under South Carolina's video gaming statutes. Lucky Strike owns and operates video amusement devices in the state. Both allege that South Carolina's statute prohibiting certain video gaming machines is

---

[1] Stewart is Chief of the South Carolina Law Enforcement Division ("SLED"); Henry McMaster is Attorney General of South Carolina; and Ralph Hoisington is Solicitor of the Ninth Judicial Circuit, South Carolina.

void for vagueness, and that enforcement of that statute violates due process and equal protection guarantees. Defendants have filed a motion to dismiss asserting the court should abstain, or alternatively, dismiss for failure to state a claim.

South Carolina's video gaming statute provides:

> It is unlawful for any person to keep on his premises or operate or permit to be kept on his premises or operated within this State any vending or slot machine, or any video game machine with a free play feature operated by a slot in which is deposited a coin or thing of value, or other device operated by a slot in which is deposited a coin or thing of value for the play of poker, blackjack, keno, lotto, bingo, or craps, or any machine or device licensed pursuant to Section 12-21-2720 and used for gambling or any punch board, pull board, or other device pertaining to games of chance of whatever name or kind, including those machines, boards, or other devices that display different pictures, words, or symbols, at different plays or different numbers, whether in words or figures or, which deposit tokens or coins at regular intervals or in varying numbers to the player or in the machine, but the provisions of this section do not extend to coin-operated nonpayout pin tables, in-line pin games, or to automatic weighing, measuring, musical, and vending machines which are constructed as to give a certain uniform and fair return in value for each coin deposited and in which there is no element of chance.
> Any person violating the provisions of this section is guilty of a misdemeanor and, upon conviction, must be fined not more than five hundred dollars or imprisoned for a period of not more than one year, or both.

S.C. Code Ann. § 12-21-2710. Enforcement of § 12-21-2710 is provided as follows:

> Any machine, board, or other device prohibited by Section 12-21-2710 must be seized by any law enforcement officer and at once taken before any magistrate of the county in which the machine, board, or device is seized who shall immediately examine it, and if satisfied that it is in violation of Section 12-21-2710 or any other law of this State, direct that it be immediately destroyed.

S.C. Code Ann. § 12-21-2712.[2]

---

[2] These statutes have an interesting history. In 1999 the South Carolina General Assembly amended existing law to prohibit cash payouts on video gaming

According to plaintiffs, the distinction between a legal and illegal video gaming machine depends on a determination of whether the device is a "game of chance." There is no regulation defining the difference between a legal and illegal video gaming device. The only way to determine a machine's legality is for the machine to be seized and examined by a magistrate, as provided in § 12-21-2712. This process subjects the owner to possible forfeiture, destruction of the machine, and criminal prosecution.

Plaintiffs assert the definition of illegal gaming machines is so broad as to give no notice of which device may be prohibited. Under plaintiffs' interpretation, the literal prohibition of any "device pertaining to games of chance of whatever name or kind" outlaws Monopoly, card games, mine sweeper, computer solitaire, and other popular pastimes. Due to this alleged vagueness, plaintiffs contend defendants' enforcement of § 12-21-2710 is inconsistent and at times contradictory and discriminatory. Plaintiffs recount instances where a solicitor's office has determined a game to be legal, while state officials found the same device illegal, or where the Attorney General's opinions have differed with those of SLED as to the same machine. If true, this haphazard enforcement can be seen as a serious threat to plaintiffs' economic rights.

---

machines and to ban certain video gaming machines, effective July 1, 2000, and initiated a statewide referendum to determine whether such payouts would be allowed in South Carolina (collectively, "Act 125"). If voters decided to allow video poker, the ban on payouts and the machines themselves would not take effect. A month before the referendum the South Carolina Supreme Court declared the referendum to be an unconstitutional delegation of the legislature's power. The court severed that unconstitutional provision of Act 125 and left the remaining aspects of the law in place. See Joytime Dist. v. State of South Carolina, 338 S.C. 634, 528 S.E.2d 647 (1999). The remainder of Act 125 went into effect on July 1, 2000, and is the subject of the present challenge.

In sum, plaintiffs contend the process for determining legality improperly subjects them to forfeiture and possible criminal prosecution, in violation of Ex Parte Young. As such, plaintiffs argue the statute offends equal protection by subjecting video game/amusement operators to obstacles not encountered by other business pursuits in South Carolina. Plaintiffs also contend the statute is void for vagueness and violates due process rights as guaranteed by the Fourteenth Amendment. Plaintiffs seek preliminary and permanent injunctive relief prohibiting enforcement of S.C. Code Ann. §§ 12-21-2710 and 12-21-2712.

## II.    DISCUSSION

Defendants contend that two abstention doctrines require this court to refrain from considering plaintiffs' claims.

### a.    Burford Abstention

Burford v. Sun Oil Co., 319 U.S. 315 (1943), generally applies to federal review of state regulatory decisions:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar;" or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

New Orleans Public Service, Inc. v. Council of City of New Orleans, 491 U.S. 350, 361 (1989) ("NOPSI"). Typical Burford cases concern a plaintiff's assertion that a state agency's decision violated federal constitutional protections. See, e.g, Fort Royal and Warren County Indus. Park Corp. v. Town of Fort Royal, 945 F.2d 760 (4th Cir. 1991)

(abstaining from constitutional challenge to land annexation orders).

Not all Burford abstentions involve a specific underlying state order. In Johnson v. Collins Entertainment, 199 F.3d 710 (4th Cir. 1999), plaintiffs alleged RICO claims against a variety of video poker operators. Plaintiffs' challenge did not arise from a specific state administrative or regulatory ruling. Nonetheless, the Fourth Circuit ultimately concluded abstention was warranted because the equitable relief requested intruded into "the legislative, administrative, and judicial processes of South Carolina and . . . matters of state law and regulatory policy that are best left to resolution by state bodies." Id. at 719-20.[3] Resolution of the federal claim required interpretation of state gaming law since the RICO claims "depend on alleged violation of state gaming law for their predicate acts." Id. at 722. Whether defendants violated state video gaming laws ultimately depended on interpretations of "such state statutory provisions as the payout limit and the prohibition on special inducements." Id. As such, the federal claims were "entangled in a skein of state law that must be untangled before federal rights can be adjudicated." Id. (quoting NOPSI, 491 U.S. at 361.). Resolution of the federal claim depended on the court's interpretation of state law; i.e., whether state law allowed or prohibited an act.

---

[3] Specifically, Johnson noted that when video poker was legal, several legislative, administrative and judicial entities worked together to regulate the industry. These entities "constitute[d] an interdependent state network aimed at the comprehensive regulation of video poker." Johnson, 199 F.3d at 715. While video poker is no longer legal, all video gaming/amusement devices are subject to the statutes at bar, and the state's executive and judicial branches work together to implement this system. Law enforcement seize the machines according to their interpretations of § 12-21-2710, and magistrates review such seizures according to § 12-21-2712.

5

Plaintiff's void for vagueness/due process claims are similarly contingent on a court's interpretation of state law. "Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." City of Chicago v. Morales, 527 U.S. 41, 56 (1999). "A regulation is not void for vagueness unless it is so unclear with regard to what conduct is prohibited that it 'may trap the innocent by not providing fair warning,' or it is so standardless that it enables 'arbitrary and discriminatory enforcement.'" Greenville Women's Clinic v. Comm., S.C. Dep't of Health and Envtl. Control, 317 F.3d 357, 366 (4th Cir. 2002) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)). In sum, the inquiry considers whether the law "fails to provide the kind of notice that will enable citizens to conform their behavior to that law." Lytle v. Doyle, 326 F.3d 463 (4th Cir. 2003).

Plaintiffs assert they ask the court to void, not to interpret. But in dissecting the void for vagueness claim, this court would have to determine what "other device pertaining to games of chance" means. The court cannot mull § 12-21-2710's clarity without delving into the statute's meaning, interpretations, and the general regulatory context. See, e.g., Greenville Women's Clinic, 317 F.3d at 367 ("we are satisfied that a reasonable person, reading the regulation in its entirety and in the context of South Carolina statutes, would be able to interpret the regulation and determine what is required and what conduct is prohibited."). The meaning of "games of chance" is the heart of South Carolina's regulation of video gaming, and is a much more appropriate issue for a

South Carolina state court to decide.

Consideration of the statute's specificity requires a degree of interpretation. A determination that the statute is clear requires interpreting state law. A conclusion that the statute is impermissibly vague similarly requires some deciphering of meaning or lack thereof. In other circumstances, this court could and should review a state law for vagueness. But the issue behind these statutes is truly sui generis. In general, gambling laws are at the core of the state's police power. In this specific context, all branches of South Carolina's government have spent considerable time and energy shaping and reviewing the statutes being challenged. The abstention analysis cannot ignore that gambling and governance of video gaming/amusement devices continue to be dominant public policy issues in South Carolina.

The court recognizes that plaintiffs raise a legitimate federal issue in whether § 12-21-2710's definition of prohibited activity is unconstitutionally vague. However, abstention requires a balance between "having federal rights adjudicated in federal court" with "state interests in the control of state regulatory programs." Johnson, 199 F.3d at 723. The state's interest is uniquely important in this circumstance. On the other hand, plaintiffs have a strong interest in airing their highly charged, politicized case in a federal forum. Nonetheless, in weighing the considerations - a federal court interpreting the core of South Carolina's video gaming law against concern for plaintiffs' federal rights in state court - the former concern is uniquely troublesome. The state's interest outweighs any perceived state court bias against plaintiffs' video gaming interests. Plaintiffs' federal claims are secure in state court and are ultimately subject to review. The state

court system - especially the South Carolina Supreme Court - is intimately familiar with the video gaming statutes and has considerable expertise construing them. As such, abstention as to plaintiffs' due process claims is proper.

For similar reasons, the court must abstain from plaintiffs' equal protection claims. Paragraph 39 of the complaint alleges plaintiffs are subject to discriminatory enforcement of §12-21-2710, among other statutes, in an effort to restrict plaintiffs' participation in the political process. Adjudication of this claim requires "untangling" the meaning of § 12-21-2710 and reviewing law enforcement application of these statutes. Numerous state agencies play a role in enforcing the video gaming statutes. Reviewing these agencies' interpretations and application of § 12-21-2710 would "arbitrate matters of state law and regulatory policy that are best left to resolution by state bodies." Johnson, 199 F.3d at 719. As stated above, federal district court is the improper forum to parse these issues. The balance of interests again favors defendants. Therefore, the court will abstain from considering plaintiffs' equal protection claim as to discriminatory enforcement, specifically, paragraph 39.

Plaintiffs request an opportunity for discovery to bolster their assertion that defendants' enforcement of § 12-21-2710 is arbitrary and discriminatory. Assuming discovery revealed evidence to support plaintiffs' allegations, this court would still have to review the agencies' interpretations and consider the boundaries of reasonable definitions. In other words, anything uncovered in discovery will not change the court's balancing of the plaintiffs' interest with the state's interests so that this court can "exercise [its] discretionary power with proper regard for the rightful independence of

state governments in carrying out their domestic policy." Johnson, 199 F.3d at 719 (quoting Buford, 319 U.S. at 318).

Plaintiffs also allege the forfeiture process violates equal protection concerns by subjecting video gaming/amusement interests to obstacles other business interests do not encounter. Specifically, plaintiffs allege they may only "obtain a determination on the legality of a proposed video amusement machine or other amusement device upon the condition that Plaintiffs subject themselves to imprisonment, fines and forfeiture of property if it is determined that the proposed video machines or other device is a "'game of chance,'" a process inconsistent with due process as outlined in Ex Parte Young. (Compl. ¶ 37.) This claim is a direct challenge to the constitutionality of the forfeiture process described in § 12-21-2712.

Section 12-21-2712 only applies to the machines identified as contraband by § 12-21-2710. To consider this equal protection challenge, the court would have to identify the persons or entities who are subject to the special classification. This inquiry would involve interpreting "other device pertaining to games of chance of whatever name or kind." Therefore, this equal protection claim is grounded on the "games of chance" definition. For the reasons stated above, abstention is proper.

Given the court's conclusion, the court need not address defendants' assertion that Younger abstention applies.

## III.    CONCLUSION

Abstention is the rare exception to the federal court's "unflagging" obligation to adjudicate claims within their jurisdiction. Deakins v. Monaghan, 484 U.S. 193, 202

(1988). However, the issues involved in this case are not the average policy considerations. The court's decision to abstain has no bearing on the merits of plaintiffs' constitutional claims. Plaintiffs' allegations of arbitrary and discriminatory interpretation and enforcement of these statutes raise important constitutional concerns which warrant serious judicial review. However, resolution of those claims are so intertwined with substantive state law issues as to require this court's abstention. Considering the Fourth Circuit's empathic remand in Johnson, a traditional Yiddish proverb reflects the wisdom of abstention in the video poker context: "Besser fri'er bevorent aider shpeter bevaint."[4]

For the reasons stated above, it is therefore **ORDERED** that defendants' motion to dismiss plaintiffs' claims be **GRANTED.**

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**June 29, 2006**
**Charleston, South Carolina**

---

[4] "Better caution at first than tears afterwards." Yiddish Wisdom 37 (1996).